**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

ZONE FIVE, LLC, et al.,

                          **Plaintiffs,**

v.

TEXTRON AVIATION, INC.,

                          **Defendant.**

**Case No. 20-1059-DDC-RES**

**BELLWETHER 1**

## MEMORANDUM AND ORDER

Plaintiffs'[1] airplanes have cracks around—and, sometimes, through—their windows. Highly summarized, plaintiffs alleged the cracking made the aircraft unsafe, defendant hid this defect, and defendant broke its promise to repair the cracking under warranty. They sued defendants on a variety of theories:  breach of express warranty, breach of implied warranty, statutory consumer-protection violations, fraud, and negligent misrepresentation.  Defendant filed a Motion for Summary Judgment (Doc. 339) against these claims.

Plaintiffs have abandoned the accusation that the cracking renders their aircraft unsafe. Instead, they focus solely on defendant's breach of its promises to repair the cracking and pay for the repair.  Plaintiffs also have grounded several of their legal theories, leaving only three claims for summary judgment:  breach of express warranty, fraud, and negligent misrepresentation. These three claims just won't fly.  The express warranties for the aircraft have expired, and

---

[1]     This Memorandum and Order addresses only the nine bellwether plaintiffs:  Bogdan Cocosel; Loki Operations, LLC; Adam Hafez; Apsis Aviation, LLC; Ben Eater; Jon-Michael Johnson; Matera Management, LLC; Alan Groves; and Farm Boys Investments, LLC.  Doc. 337 at 1 (PTO).

defendant didn't waive its right to enforce the warranties' time limitations.  Plaintiffs try to conjure a new express warranty, but they have adduced no admissible evidence of the terms of that warranty.  For their other claims, plaintiffs have nothing to support key elements.  They cite no evidence or legal authority about their reliance on defendant's misrepresentations.  Nor have they adduced any evidence or authority supporting the view that defendant had a duty to disclose information to them.

The court explains these conclusions below.  It begins with the relevant facts governing summary judgment.

## I.       Factual Background[2]

Before it gets into the facts, the court must address plaintiffs' attempt to blame defendant for their lack of evidence.  As will become clear, several of defendant's summary-judgment

---

[2]        Plaintiffs assert an admissibility objection to documents defendant cites in its facts section.  Plaintiffs train their focus on the following defense exhibits:  1–16, 18–26, and 28–30.  They assert that defendant has failed to provide any "testimony, affidavit, or request for judicial notice demonstrating that those documents are admissible[.]"  Doc. 362 at 28.  Plaintiffs argue that defendant, as proponent of these documents, must "thoroughly explain the admissible form" in which defendant will introduce that document at trial.  *Id.*  This is a nearly frivolous argument.

Plaintiffs cite no authority for the requirement that an evidence's proponent must chart an admissibility course at summary judgment.  And plaintiffs seem to have forgotten that they stipulated to the admissibility of 18 of the exhibits about which they complain.  *See* Doc. 337 at 7–10 (PTO ¶ 2.b.) (stipulating to admissibility of defense exhibits 5, 6, 7, 8, 13, 14, 18, 19, 20, 21, 22, 23, 24, 25, 26, 28, 29, and 30).  Plaintiffs thus have waived any admissibility objection to these exhibits.  *See United States v. Aptt*, 354 F.3d 1269, 1281 (10th Cir. 2004) ("We think a stipulation, which by its very nature signals the intentional relinquishment of any and all rights to challenge the admissibility of the stipulated evidence, is a clear example of waiver if anything is.").  What's more, plaintiffs rely on several of these exhibits in their own summary-judgment response.  Doc. 362 at 12 (citing defense exhibits 6, 8, 14, 15, 18, 20–26); *id.* at 15 (citing defense exhibit 15); *id.* at 20 (citing defense exhibits 1, 2, 9, and 28); *id.* at 21 (citing plaintiffs' exhibit 28, which is identical to defense exhibit 4).  So, the court declines to exclude these exhibits.  *See Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 1000 (10th Cir. 2019) ([D]efendants waived any objections to the admissibility of the reports by offering them themselves." (quotation cleaned up)).

And in any event, the court does "not require an affidavit to authenticate every document submitted for consideration at summary judgment."  *L. Co. v. Mohawk Constr. & Supply Co.*, 577 F.3d 1164, 1170 (10th Cir. 2009).  True, defendant couldn't admit these documents at trial—on their own.  But there are ways for defendant to make these documents admissible.  That's all Rule 56(c)(2) requires at the

arguments assert that plaintiffs have failed to prove something—*i.e.*, proof of a warranty. Plaintiffs assert that they tried to conduct discovery on these issues and defendant is "the sole holder of the relevant information[.]" Doc. 362 at 30. But, plaintiffs complain, defendant denied them discovery on these critical topics. So, plaintiffs ask the court to preclude defendant from "rely[ing] on arguments for which opposition would depend on the discovery Plaintiffs were denied." *Id.* at 32.

At this juncture in this nearly six-year-old case, it's time to fish or cut bait. Our court requires parties to file all discovery-related motions within 30 days of the deficient discovery response. D. Kan. Rule 37.1(c). If plaintiffs had genuine issues with defendant's discovery responses, they should've filed a timely motion to compel. *Escalante v. LifePoint Hosp. Inc.*, No. 17-2035-HLT, 2019 WL 2743910, at *4 (D. Kan. July 1, 2019) ("Defendant did not move to compel and cannot now ambush Plaintiffs at the summary judgment stage without having raised these issues earlier." (footnote omitted)). Summary judgment certainly isn't the time to raise it. Plaintiffs halfheartedly invoked Fed. R. Civ. P. 56(d) with a stray cite. *See* Doc. 362 at 31. That's the rule allowing courts to help summary-judgment nonmovants when "a nonmovant shows by affidavit of declaration that, for specified reasons, it cannot present facts essential to justify its opposition[.]" Fed. R. Civ. P. 56(d). Plaintiffs haven't proffered the required affidavit, nor specified their discovery woes. Nor have plaintiffs offered any other authority supporting the relief they seek. The court thus declines to act on plaintiffs' untimely discovery complaints. On to the facts.

### *Corporate History*

---

summary-judgment stage. *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005) ("At the summary judgment stage, the parties need not submit evidence in a form admissible at trial; however, the content or the substance of the evidence must be admissible.").

In the 1990s, a company called Lancair manufactured the single-engine, four-seat aircraft at issue in the lawsuit:  the LC40 and LC41.  *See* Doc. 337 at 5 (PTO ¶ 2.a.i.).  In 2005, Lancair rebranded to Columbia Aircraft Manufacturing Corporation.  *Id.* (PTO ¶ 2.a.ii.).  In 2007, Columbia declared bankruptcy.  *Id.* (PTO ¶ 2.a.iii.).  Cessna Aircraft Company, a wholly owned subsidiary of Textron Inc, purchased Columbia's assets out of that bankruptcy.  *Id.* (PTO ¶ 2.a.iv.).  In 2014, Cessna eventually became part of defendant Textron Aviation, Inc.  So, depending on the year, the court may refer to the relevant actor as Lancair, Columbia, Cessna, or defendant.

### *Warranties*

When a buyer purchased an aircraft from Lancair or Columbia, they received either (1) the Lancair Limited Warranty, or (2) the Columbia Aircraft Manufacturing Corporation Limited Warranty (CAM Warranty).  The Lancair Warranty covered defects for a period of years—either three years, Doc. 340-4 at 1 (Def. Ex. 4), or five years, Doc. 340-5 at 1 (Def. Ex. 5)—or 900 flight hours, whichever accrued first.  Similarly, the CAM Warranty covered defects for three years or 900 flights hours, whichever accrued first.  Doc. 340-10 at 1 (Def. Ex. 10).

Both warranties provided that the exclusive remedy was repair or replacement.  Doc. 340-2 at 1 (Def. Ex. 2); Doc. 340-10 at 1 (Def. Ex. 10).  Both warranties disclaimed all other express or implied warranties.  Doc. 340-5 at 2 (Def. Ex. 5); Doc. 340-10 at 2 (Def. Ex. 10).  Both warranties extended only to the original owner, and the original owner could transfer the warranty to another party only with written approval by either Lancair or Columbia.  Doc. 340-5 at 2 (Def. Ex. 5); Doc. 340-10 at 1 (Def. Ex. 10).  Both warranties also required owners to bring any warranty actions within a specified time.  The Lancair Warranty required owners to bring a claim "within the time and term of duration specified for th[e] warranty"—*i.e.*, three or five years.  Doc. 340-2 at 2 (Def. Ex. 2) (quotation cleaned up); Doc. 340-5 at 2 (Def. Ex. 5)

(quotation cleaned up).  The CAM Warranty required owners to commence an action "within one year after a breach of this warranty has been or reasonably should have been discovered."  Doc. 340-10 at 1 (Def. Ex. 10) (quotation cleaned up).  And both warranties stated that no agent, employee, or representative of Lancair or Columbia could change the warranty.  Doc. 340-5 at 2 (Def. Ex. 5); Doc. 340-10 at 2 (Def. Ex. 10).

### *Cracking & Repairs*

As early as 2002, Lancair received reports of cracking around the perimeter of the aircraft's windows and windscreens.  *See* Doc. 363-48 at 2 (Pl. Ex. 48).  In 2006, Columbia began issuing service letters titled "Window Cosmetics" that explained how to repair the paint cracking around the windows.  *See, e.g.*, Doc. 340-6 at 1 (Def. Ex. 6); Doc. 340-8 at 1 (Def. Ex. 8).[3]  These service letters explained that the cracks were cosmetic, and compliance was optional.  *See, e.g.*, Doc. 340-6 at 1 (Def. Ex. 6); Doc. 340-8 at 1 (Def. Ex. 8); Doc. 320-23 at 1 (Def. Ex. 23).

### *Columbia Bankruptcy*

Columbia filed for bankruptcy in 2007.  Doc. 337 at 5 (PTO ¶ 2.a.iii.).  In October 2007, Cessna, defendant's subsidiary, entered into a Purchase and Sale Agreement to purchase Columbia's assets.  Doc. 340-17 at 2–3 (Def. Ex. 17).  Cessna knew about the window-cracking

---

[3]    To the extent plaintiffs contend that all service publications suggest "the repairs were covered by a credit program / under warranty" the court rejects such a suggestion.  Doc. 362 at 11–12.  The April 2006 service bulletin, No. SL-06-009, says no such thing.  *See* Doc. 340-6 (Def. Ex. 6).  The same goes for service bulletin SL-06-012 from June 2006—it doesn't mention coverage under a credit program or warranty.  *See* Doc. 340-8 (Def. Ex. 8).  A June 2007 service letter, SL-06-012A, doesn't say anything about warranty coverage.  *See* Doc. 340-14 at 1 (Def. Ex. 14).  A December 2007 service bulletin, No. SL-06-009A, revised the April 2006 service bulletin merely to reflect the company name change to Cessna.  *See* Doc. 340-18 at 1 (Def. Ex. 18).  Also, a January 2008 updated Service Letter, SL-06-12B, merely updated the company name to Cessna.  *See* Doc. 340-20 at 1 (Def. Ex. 20).  Same for the February 2008 Service Letter SL-06-012C; it merely revised the company name.  Doc. 340-21 at 1 (Def. Ex. 21).  None of these documents supports plaintiffs' assertion.

issue when they purchased Columbia.[4]  Doc. 363-7 at 57 (Ake Dep. 55:5–19).  In November 2007, the bankruptcy court issued a Sale Order approving Cessna's purchase of Columbia's assets.  *See generally* Doc. 340-17 (Ex. 17).

Under the Sale Order, Columbia sold its assets to Cessna, and Cessna purchased those assets "free and clear of all [i]nterests, except the Assumed Liabilities."  *Id.* at 9.  Before the final sale, Cessna told owners that Assumed Liabilities included "liability for the amount of aggregate potential warranty claims arising from Products sold by [Columbia] prior to the Closing Date"— December 4, 2007.  Doc. 340-15 at 4 (Def. Ex. 15).[5]  Cessna also informed owners that it didn't assume any liability to pay "claims for rescission of purchase agreements for aircraft purchased from [Columbia] prior to the sale closing date . . . including but not limited to claims against [Columbia] for return or repurchase of aircraft previously sold by [Columbia.]"  *Id.* at 2.

---

[4]    Plaintiffs assert that defendant "confirmed that, at the time Cessna purchased CAM in bankruptcy, it was in the process of trying to fix the window perimeter cracking issue."  Doc. 362 at 12.  The cited deposition testimony doesn't support plaintiffs' assertion.  First of all, plaintiffs cite page 208 of Richard Ake's deposition, but that page doesn't exist—or plaintiffs failed to include it in their exhibit.  *See generally* Doc. 363-7 (Ake Dep.).  And, on the other three cited pages, Ake doesn't say anything about Cessna working on a fix at the time of Columbia bankruptcy.  *See id.* at 57 (Ake Dep. 55:1–25) (discussing Cessna's knowledge of the cracking issue before the bankruptcy); *id.* at 60 (Ake Dep. 58:1– 25) (testifying about awareness of other perimeter cracks, particularly window-transparency fractures); *id.* at 100 (Ake Dep. 98:1–25) (discussing Ake's review of unspecified service letter following approval and distribution).

[5]    Plaintiffs object that the court documents from the bankruptcy "cannot be presented in an admissible form[.]"  Doc. 362 at 29.  Defendant responds that the court may take judicial notice of these documents.  Doc. 369 at 31.  Courts may take judicial notice of a fact "that is not subject to reasonable dispute because it:  . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  The bankruptcy documents satisfy this standard.

    "[F]ederal courts, in appropriate circumstances, may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue."  *St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir. 1979).  The Columbia bankruptcy proceedings relate directly to this case—plaintiffs base their claims on those bankruptcy proceedings.  In a last-ditch effort, plaintiffs claim that these documents are the subject of a factual dispute.  Doc. 362 at 30.  That's just not the case.  Plaintiffs don't dispute that the documents and audio recording from the bankruptcy case are, in fact, the documents and audio recording from the bankruptcy case.  And defendant offers these exhibits properly "to show their contents, not to prove the truth of matters asserted therein."  *Johnson v. Spencer*, 950 F.3d 680, 705 (10th Cir. 2020) (quotation cleaned up).

6

Defendant asserts that the Sale Order limited Cessna's liability to any claim "under existing warranties arising from aircraft sold prior to December 4, 2007." Doc. 340 at 14. Plaintiffs dispute this. Doc. 362 at 4. More about this dispute, later.

Back to the Sale Order. Paragraph six of the Sale Order required Cessna to "send to all known owners who are currently covered by a warranty from [Columbia] (collectively, an "Unexpired Warranty"), a standard Certificate of Warranty from Cessna good for the remaining term of the Unexpired Warranty from [Columbia]." Doc. 340-17 at 10 (Def. Ex. 17). This "new Cessna Warranty" replaced "the Unexpired Warranty in its entirety, unless an existing Unexpired Warranty held by an owner provide[d] greater rights to such owner, in which case the existing Unexpired Warranty shall apply." *Id.* Plaintiffs' legal theories here rely heavily on this new Certificate of Warranty. The Sale Order further provided that for "all persons and entities who received actual notice of the Motion or the Sale, [Cessna] shall have no liability or responsibility for any liability or other obligation of [Columbia] arising under or related to the Assets other than as expressly set forth in the Agreement." *Id.* at 11.

Plaintiffs have submitted declarations from two aircraft owners—Steve Masters and Richard Page—who attended a 2007 bankruptcy hearing about Cessna's purchase of Columbia. *See* Doc. 363-30 at 2 (Masters Decl. ¶ 3); Doc. 363-53 at 2 (Page Decl. ¶ 4). Masters attested that "during the bankruptcy hearing, a representative of Cessna, Jack Pelton, President of Cessna Aircraft Company, acknowledged the known defect that was referred to as 'cosmetic window perimeter cracking[.]'" Doc. 363-30 at 3 (Masters Decl. ¶ 4). Masters recalled the owner representatives—the Cessna Advanced Aircraft Club's (the Club)[6] president and the Club's

---

[6]     Plaintiffs call the Club "a large owners' group dedicated to education and support for TTx owners." Doc. 337 at 17 (PTO). Despite its name, the Club doesn't appear connected formally to Cessna.

attorney—testifying during the bankruptcy hearing about concerns over the window cracking "and Cessna's intent to resolve the issue under warranty." *Id.* (Masters Decl. ¶ 5). According to Masters, Cessna's president told the court that Cessna "would resolve the 'cosmetic window perimeter cracking' problem for all affected aircraft. All aircraft currently under warranty at the time of the acquisition of Columbia Aircraft assets by Cessna would be covered and have the defect repaired at no cost to the owner by Cessna." *Id.* (Masters Decl. ¶ 6). Page attested to something similar. Page asserted that during the bankruptcy hearing, the Club's attorney "and the Cessna representative reached an agreement that this issue would be considered warranty and therefore would be covered under the existing warranty agreement." Doc. 363-53 at 2–3 (Page Decl. ¶ 5).

### *Cessna's 2008 Communications*

In January 2008, Cessna sent customers a letter after it had purchased Columbia in the bankruptcy proceedings. *See* Doc. 363-3 at 2–4 (Pl. Ex. 3). This letter provides that, as "a part of the acquisition, Cessna agreed to provide warranty coverage for the current aircraft fleet that are still within their original warranty period." *Id.* at 4. Cessna "also agreed to consider claims that were on file with Columbia prior to Cessna ownership." *Id.* Cessna told customers to file all warranty claims within 30 days of completing of a repair. *Id.*

At some point in 2008, shortly after the bankruptcy proceedings, Cessna held a "fly-in" meeting with aircraft owners at Cessna's Wichita facility. Doc. 363-52 at 2 (Stewart Decl. ¶ 4). Plaintiffs have submitted a declaration from Dale Stewart, who attended this meeting. *Id.* According to Stewart, during this Wichita meeting, the owners asked Rebecca Williams, a Cessna employee, about the window cracking. Doc. 363-46 at 3 (Pl. Ex. 46). Stewart claimed that Williams "replied, basically, how many times and ways do we have to tell you that we are going to take care of it?" *Id.* Stewart attested that, over the course of the Wichita meeting, the

window cracking was discussed several more times "and each time we were reassured that Cessna was committed to providing the repair, and to providing the repair under warranty." Doc. 363-52 at 3 (Stewart Decl. ¶ 7).

In July 2008, Steve Masters wrote to Peter Wilkinson, a Cessna employee, about the window-cracking problem. Doc. 363-16 at 3 (Pl. Ex. 16). Wilkinson sent Masters the active service letter. *Id.* Wilkinson also told Masters that Cessna was working on a new service letter. *Id.* Wilkinson mentioned that Cessna was studying how long the fix would take. *Id.* Masters mentioned that prior service letters, issued by Columbia, had "a common problem . . . where their work estimates were just nuts." *Id.* at 2. Wilkinson responded that the new service letter would "be the 'new improved' Cessna version with an actual time study completed . . . now if you ask me 'will this solve the problem' . . . I will take a long time to respond . . ." *Id.* (ellipses in original).

In November 2008, Wilkinson emailed Masters about the cracking issue, based on conversations about the window cracking on the Club's website:

**From:** Wilkinson, Peter <PWilkinson@cessna.textron.com>
**Sent:** Friday, November 14, 2008 5:24 AM
**To:** Steve Masters <Steven.Masters@microsoft.com>
**Subject:** RE: Service Letter

On a different subject;

I think my perspective is that if the cracks are a concern to an owner they can get them repaired to the current standard or wait for the revised SB which is due out any time (well I would say that).

If an owner's warranty has expired or close to expiring we will not decline warranty for this known issue. Now this does not mean that the airframe warranty is unlimited in this area, just that we will work with an owner to get the remedial work done under warranty.

Peter

Doc. 363-17 at 3 (Pl. Ex. 17). In a later email on the chain, Wilkinson told Masters:

> As for the crack/ warranty issue, we do not need to burden the owners with some bureaucratic process. Short answer is that we will take care of it and owners should not worry if their warranty is expired or about to expire........It is said that the new bulletin will yield better results. So my advice is to wait until its released. – I don't know a release date yet, but this year for sure.

*Id.* at 2.

Also in November 2008, a Club member named Dale Stewart posted on the Club's website that he'd "been told by the southwest rep, the Cessna folks at the factory fly-in, and my local dealer that if the cracks are documented you can wait for the new fix and they will still be covered[.]" Doc. 363-49 at 3 (Pl. Ex. 49).

### *Cessna's Fix:  SB08-56-01*

A month later, in December 2008, Cessna issued a "Service Bulletin" numbered SB08-56-01, which provided additional instructions for repairing the cracks.  Doc. 363-14 (Pl. Ex. 14). Plaintiffs emphasize the "Credit Information" section of the Service Bulletin.  It provides:

**CREDIT INFORMATION**

For airplanes in warranty if the condition is present as described in this SB08-56-01.

If necessary, applicable parts credit and labor allowance credit of 7.5 man-hours per window will be provided to remove the cosmetic filler, replace the filler with Devcon Plastic Welder II, and paint around a left or right rear window. A photo of the cosmetic crack before the repair will be required. Include window location and airplane serial number in each photo.

If necessary, applicable parts credit and labor allowance credit of 7.7 man-hours per window will be provided to remove the cosmetic filler, replace the filler with Devcon Plastic Welder II, and paint around a left or right door window. A photo of the cosmetic crack before the repair will be required. Include window location and airplane serial number in each photo.

If necessary, applicable parts credit and labor allowance credit of 8.7 man-hours will be provided to remove the cosmetic filler, replace the filler with Devcon Plastic Welder II, and paint around the windshield. A photo of the cosmetic crack before the repair will be required. Include window location and airplane serial number in each photo.

To receive credit, the work must be completed and a Warranty Claim submitted by a Cessna Single Engine Service Station within 30 calendar days of Service Bulletin compliance before the credit expiration dates shown below.

Domestic.............................December 1, 2009
International..........................December 1, 2009

10

Doc. 363-14 at 13 (Pl. Ex. 14).

Service Bulletin SB08-56-01 was not long for this world.  A few months later, in February 2009, Cessna suspended compliance with SB08-56-01.  Doc. 340-26 at 1 (Def. Ex. 26). This February 2009 service bulletin included the same "Credit Information" from SB08-56-01, depicted above.  *Id.* at 4.

Also in February 2009, Cessna sent letters, updating its customers on the status of the window-cracking repairs.  *See, e.g.*, Doc. 363-13 at 2 (Pl. Ex. 13).  None of the letters are addressed to any plaintiffs at issue in this Order.  *See id.* at 2–7.  In the letters, Cessna advised owners that the aircraft on which Cessna had tested the repair had "cracks showing after 6 months of service."  *Id.* at 2.  Those letters promised to revise service bulletin SB08-56-01 and SL-06-012C to "provide a more reliable repair of the cosmetic cracks[.]"  *Id.*  The letter closed with, "As we have promised in the past, warranty coverage will be available for repairs covered by this service bulletin."  *Id.*  Defendant didn't release that revised repair for more than 15 years.

### *The Lost Years*[7]

---

[7]    Plaintiffs maintain that defendant has represented to its customers "from 2008 onward that it would repair the window perimeter cracking under warranty, regardless of ownership."  Doc. 362 at 24. To support this fact, plaintiffs cited Ake's deposition at pages 148 through 159.  But the deposition excerpt plaintiffs submitted doesn't include these pages.  *See* Doc. 363-7 (Pl. Ex. 7).  The court's recounting describes facts supplied by the other exhibits plaintiffs cite about defendant's representations.

Speaking of missing exhibits, plaintiffs also assert that one of defendant's employees, Barry Wells made statements in 2009 about service bulletin and service letter credit programs.  Doc. 362 at 16. But plaintiffs' citations for this assertion do not include any such statement by Wells.  Plaintiffs first cite their Exhibit 57—Well's deposition—at page six.  Page six contains a conversation between the attorney and the videographer; there's no statement from Wells.  Doc. 363-57 at 8 (Wells Dep. 6:1–25).  Plaintiffs next cite their Exhibit 56 at pages 26, 27, and 122 through 134.  Doc. 362 at 16.  The problem:  Exhibit 56 ends at page 11.  *See generally* Doc. 363-56 (Pl. Ex. 56).  Because plaintiffs' assertion about Wells's 2009 statement is unsupported by the cited evidence, the court disregards it.

Plaintiffs make much of defendant's statements after defendant pulled SB08-56-01. The court summarizes plaintiffs' cited statements, below. Note that no plaintiff at issue here received any of these statements.

In 2010, Richard Ake, a member of Cessna's customer-service team, handled a complaint from a caller, Andrea Hudson, about cosmetic window cracks on an aircraft. Doc. 363-8 at 2 (Pl. Ex. 8). Ake told Hudson that the paint cracking was "a known condition" and that "a service bulletin is being developed by Cessna for corrective action." *Id.* at 3. Ake also wrote, "the credit program will be applicable when the bulletin is released."[8] *Id.*

In August 2010, Steve Charles, Cessna's Director of Field Operations, wrote a letter to aircraft owner Steve Masters. Doc. 363-20 at 2 (Pl. Ex. 20). The letter confirmed that once Cessna had "a proven method for long term repair; Cessna will pay for materials and labor to repair cracking including paint touch up. This credit will apply to any aircraft that was in warranty at the time of Cessna's purchase of Columbia." *Id.*

In October 2011, a Cessna employee named Dave Meyer told a maintenance director at an aviation company that an "owner changing will not affect the warrantable window cosmetic cracking issue." Doc. 363-40 at 5 (Pl. Ex. 40).

---

[8]    Plaintiffs assert that "Ake confirmed that 'credit program' meant the cost would be paid for in accordance with a service bulletin." Doc. 362 at 16. But the deposition testimony cited by plaintiffs doesn't support this assertion. Two of the cited excerpts merely describe Ake's role within Cessna's so-called core team assigned to deal with this aircraft. *See* Doc. 363-7 at 34–43 (Ake Dep. 32:1–41:25); *id.* at 53–55 (Ake Dep. 51:1–53:25). The other pages cited by plaintiffs—pages 193–96—aren't included in plaintiffs' Exhibit 7. *See generally* Doc. 363-7 (Pl. Ex. 7). The court declines to forage through the record in search of record support for this assertion. *See Cross v. Home Depot*, 390 F.3d 1283, 1290 (10th Cir. 2004) (explaining that "it is the responding party's burden to ensure that the factual dispute is portrayed with particularity, without depending on the trial court to conduct its own search of the record" (quotation cleaned up)). So, plaintiffs have failed to support their asserted fact with their cited summary-judgment evidence, and the court won't consider it at summary judgment.

In November 2011, a Cessna employee named Craig Cuthbertson emailed Michael Simmons, an aircraft owner, after Simmons reported window cracking.  Doc. 363-29 at 2 (Pl. Ex. 29).  Cuthbertson told Simmons that Cessna was evaluating materials and, once it approved new materials, it would issue a service bulletin.  *Id.*  After Cessna issued the bulletin, Cuthbertson said, Cessna would "correct these cosmetic cracks . . . regardless of ownership."  *Id.*

Also in November 2011, Terry Shriner—who worked as Cessna's business leader for the aircraft—posted on the Club's online forum.  Doc. 363-54 at 2–3 (Pl. Ex. 54).  Shriner addressed online frustration about the window cracking.  *Id.* at 4–6.  Shriner updated the group about some failed testing:  "With the latest released Service Bulletin, we repaired a field aircraft and after 6 months it started to develop paint cracks in the same manner as has been exhibited by other aircraft."  *Id.* at 4.  Shriner reported that he didn't have a schedule but was trying to get results.  *Id.*

In April 2012, some Cessna employees, including Shriner, had an internal discussion about a fix for the cracking.  Doc. 363-51 at 2 (Pl. Ex. 51).  Shriner warned that the Club "periodically drops comments about a class action activity to force the issue.  Cessna I think made a commitment during the purchase proceedings of Columbia to address the issue under warranty for aircraft that were still covered at the time of purchase."  *Id.*

In September 2012, Cessna employee Barry Wells sent a letter to A.J. Wittman about the window cracking on Wittman's aircraft.  Doc. 363-21 at 2 (Pl. Ex. 21).  In the letter, Wells told Wittman that it was testing a new repair.  *Id.*  Wells suggested Cessna would issue a service bulletin if the new repair completed testing.  *Id.*  And, Wells wrote, if Cessna issued the bulletin, then it would "correct these cosmetic cracks . . . regardless of ownership."  *Id.*

13

In 2014, one of defendant's employees, Richard Ake, sent a letter to Jonathan Sackier about window cracking on his aircraft.  Doc. 363-22 at 2 (Pl. Ex. 22).  Ake told Sackier that Cessna was evaluating new materials and processes and, once approved, Cessna would issue a service bulletin to correct the condition.  *Id.*  Ake also told Sackier that after Cessna issued the bulletin, it would "correct these cosmetic cracks . . . regardless of ownership."  *Id.*

### *Motion to Reopen Columbia Bankruptcy*

In 2016, the Club moved to reopen the Columbia bankruptcy.  *See* Doc. 285-6 at 2 (Compl. Ex. F).  In their operative Complaint, plaintiffs allege that Cessna, during the Club's bankruptcy-reopening litigation, had represented to the bankruptcy court "that the defect would be corrected, and the cracks would be repaid no matter when the defect developed."  Doc. 285 at 148 (Compl. ¶ 665).  That's not quite what Cessna's filing says.  In the relevant filing, Cessna asserted, "[I]t is undisputed that Cessna undertook certain warranty obligations to owners of certain aircraft[.]"  Doc. 340-47 at 3 (Def. Ex. 47).

Plaintiffs also claim that, during the hearing on the motion to reopen, defendant's representative "acknowledged that the window perimeter cracking issue applied to 500–600 aircraft, that Defendant was continuing to—and committed to—resolving the issue, and that Defendant was not denying the warranty which it intended to honor."  Doc. 362 at 15.  Plaintiffs don't cite a specific time stamp in the hearing when defendant's attorney made this statement.  As best the court can tell, plaintiffs are citing the portion where defendant's attorney said, "Cessna isn't denying the warranty.  If you look at . . . a warranty, it covers all sorts of things.  And Cessna, even as late as about five months, has continued to try and resolve this issue."  Doc. 340-27 (Def. Ex. 27) at 5:53–6:08.

Defendant's attorney goes on to assert that the issue is a cosmetic one:  paint cracking around windows on 500 or 600 aircraft.  *Id.* at 6:11–6:27.  The attorney recited paragraph six of

the Sale Order, which required Cessna to send, within 60 days, a Certificate of Warranty "to all known owners who are currently covered by a warranty from" Columbia. *Id.* at 7:46–7:57 (quoting Doc. 340-17 at 10 (Def. Ex. 17)). And, as the attorney recited, that Certificate of Warranty was "good for the remaining term of the Unexpired Warranty from" Columbia. *Id.* (quoting Doc. 340-17 at 10 (Def. Ex. 17)). Later, defendant's attorney points out:

> It would be a matter of state law in terms of whether or not there's been a breach of the warranty . . . There's a huge issue on that particular point. There's also several issues that I'm sure would arise in terms of the factual differences between all of these claims because some of these planes don't exhibit these problems. . . . Cessna continues to try and . . . resolve the issue, which is cosmetic . . . . But they still are trying because they want the goodwill of these owners. . . . But there are many factual issues that would come in—which warranty applies, whether it's expired, whether they made claims. And what you really have here is somebody trying to circumvent all those issues[.]

*Id.* at 9:40–10:35.[9]

The bankruptcy court denied the Club's motion to reopen for lack of jurisdiction. *Id.* at 15:49–15:56.

### *The New Service Bulletin*

In 2024, defendant published a new service bulletin, SEB-53-03, to address the window cracking. *See* Doc. 363-18 at 2 (Pl. Ex. 18). This was the first approved repair available since defendant suspended SB08-56-01 in 2009. SEB-53-03 differs from SB08-056-01 in one major way: it doesn't include a credit program. *See generally id.* Put simply, the new service bulletin doesn't contain warranty coverage. Doc. 363-11 at 212 (Nieman Dep. 211:3–10).

---

[9]    Plaintiffs assert that, during "the 2016 hearing to reopen the bankruptcy proceedings, Defendant does not state that it *only* undertook certain warranty obligations to owners of certain aircraft. Defendant's representations do not exclude other obligations." Doc. 362 at 15. In support of this assertion, plaintiffs cite an exhibit: the 2007 Notice of Intent to Sell. *See* Doc. 340-15 (Def. Ex. 15). The court can't tell why this exhibit is relevant to a hearing that occurred in 2016. And plaintiffs don't cite a specific page of the 81-page exhibit. *See* Doc. 362 at 15. The court thus disregards this assertion. *See Unal v. Los Alamos Pub. Schs.*, 638 F. App'x 729, 742 (10th Cir. 2016) (explaining that district courts are "under no obligation to parse through the record to find . . . uncited materials").

Against this backdrop, the court next recites the relevant facts for each plaintiff at issue on the current motion.

### *Plaintiff Ben Eater*

In November 2007, Columbia sold a Columbia 400—serial number 411009—to third party Frank McDowell.  Doc. 340-16 at 1 (Def. Ex. 16).  The sale included the three-yar CAM warranty.  *Id.* at 5.  At some point, a different third party named Van Bortel Aircraft, Inc. bought the aircraft.  *See* Doc. 340-29 at 1 (Def. Ex. 29).  In February 2021, plaintiff Ben Eater purchased the aircraft.  *Id.*  Eater bought the aircraft as-is.  *Id.*  And the purchase agreement doesn't transfer the original CAM warranty to Eater.  *See generally id.*

When Eater bought the aircraft, it already had cracks around the windows.  Doc. 340-34 at 2 (Def. Ex. 34).  In an interrogatory response, Eater claimed that the seller, Van Bortel, told him that the cracking was common and merely cosmetic.[10]  *Id.*  Van Bortel also told Eater that the manufacturer was working on a fix and would provide a repair in the future.  *Id.*  At his deposition, Eater confirmed that he heard all of this from a Van Bortel employee, who didn't represent that he spoke on defendants' behalf.  Doc. 340-43 at 14 (Eater Dep. 44:25–45:4, 46:7–16); *see also* Doc. 363-37 at 14 (Eater Dep. 40:2–41:17).  Eater testified that the Van Bortel employee "was just relaying what he had heard."  Doc. 340-43 at 14 (Eater Dep. 46:7–16).  Eater also testified that he knew about the lawsuit when he bought the aircraft.  *Id.* at 4–5 (Eater Dep. 7:24–8:11).

---

[10]   Defendant objects to Eater's recounting of Van Bortel's statement on hearsay grounds.  Doc. 369 at 9.  But the court can see an admissibility path for this statement:  Plaintiffs don't offer this statement for its truth.  Rather, plaintiffs could offer this statement for effect that this statement had on Eater.  Defendant makes similar objections to other plaintiffs' recounting of third-party statements, *id.*, and the court overrules those objections, too, and for the same reason.

In another interrogatory response, Eater claimed that Cessna had "put out to the community including through [the Club] that these cracks are only cosmetic and it would repair them." Doc. 340-34 at 4 (Def. Ex. 34). At his deposition, Eater said he "may have" seen a post on the Club's online forum but couldn't recall if he saw a post before or after he purchased the aircraft. Doc. 340-43 at 5 (Eater Dep. 9:12–19). Eater also testified that no one from defendant had ever made any promises to him personally about any kind of cracking. *Id.* at 17 (Eater Dep. 58:22–59:16).

A different interrogatory asked Eater to identify warranties that defendant made to him. Doc. 340-39 at 1 (Def. Ex. 39). Eater responded by citing, among other things, SB08-56-01— the December 2008 service bulletin issued by Cessna—and the subsequent revocation of that bulletin in early 2009. *Id.* at 2–3. Cessna issued SB08-56-01 (and revoked it) before Eater bought his aircraft. Eater also cited other letters and the attorney statements in the 2016 bankruptcy reopening proceedings. *Id.* at 3. All predated Eater purchasing his aircraft. And, at his deposition, Eater testified that he never had communicated with defendant or any of defendant's representatives. Doc. 340-43 at 11 (Eater Dep. 33:9–20).

After Eater bought his aircraft, it sustained a crack through one pane of a window, a phenomenon the parties call a "through-crack." *Id.* at 15 (Eater Dep. 49:19–22). On his mechanic's advice that it was safe, Eater flew the aircraft—through-crack and all—from San Carlos, California, to Monterey, California, to have it repaired. *Id.* at 15–16 (Eater Dep. 50:17– 52:8). Eater testified that his insurance had reimbursed him for the through-crack repair, and he wasn't seeking reimbursement unless his insurer reopened the already-paid claim. *Id.* at 18 (Eater Dep. 62:17–63:3).

17

Eater flies his plane monthly with friends or family. *Id.* at 17–18 (Eater Dep. 59:22–60:3). He testified that he wouldn't fly with these passengers—or fly the plane at all—if it were unsafe. *Id.* at 18 (Eater Dep. 60:4–7). Excluding the through-cracking, everyone Eater has talked to has described the cracking as cosmetic. *Id.* (Eater Dep. 60:18–22). The FAA requires a yearly inspection of Eater's aircraft by a certified mechanic, and none of these inspections ever has deemed the aircraft unsafe or not airworthy. Doc. 340-39 at 6 (Def. Ex. 39).

### *Plaintiff Adam Hafez/APSIS*

In 2001, Lancair manufactured an aircraft with serial number 40027 and sold it to third party Lantis Consulting. Doc. 340-1 at 1 (Def. Ex. 1). The aircraft came with the five-year Lancair Warranty. *Id.* at 2. In 2006, after a lease-back agreement, defendant sold the aircraft again and issued a three-year CAM warranty. Doc. 363-27 at 2 (Def. Ex. 27). The aircraft changed owners several times until, in 2019, plaintiff APSIS Aviation LLC bought it from Brian and Ruth Preston. Doc. 340-28 (Def. Ex. 28). Plaintiff Adam Hafez is the sole member of APSIS Aviation, Doc. 340-42 at 8 (Hafez Dep. 20:24–21:8), so the court will refer to these plaintiffs collectively as Hafez.

In the purchase agreement between Hafez and the Prestons, Hafez agreed to accept the aircraft as is. Doc. 340-28 (Def. Ex. 28). The purchase agreement doesn't purport to transfer the original Lancair Warranty to Hafez. *See id.* When Hafez bought the aircraft, there wasn't any visible cracking. Doc. 340-42 at 15 (Hafez Dep. 50:16–51:5). Hafez believes that the Prestons had the aircraft painted to conceal the cracking. *Id.* at 16 (Hafez Dep. 55:4–25). The cracks appeared on Hafez's aircraft shortly after he bought it. *Id.* at 15 (Hafez Dep. 50:25–51:5).

After he bought the aircraft in 2019, a fellow Columbia owner told Hafez that the aircraft had cosmetic cracking around the windows and Cessna was working on a fix. *Id.* at 9 (Hafez Dep. 24:8–25). Others—another plane owner and a friend—told Hafez that all of these aircraft

18

had window cracking and Cessna was working to "fix the fleet so the cracking is no longer an issue." *Id.* at 19 (Hafez Def. 65:5–22).  When asked to identify defendant's misrepresentations, Hafez, like Eater, responded in an interrogatory that Cessna had "put out to the community including through [the Club] that these cracks are only cosmetic and that they would repair them."  Doc. 340-35 at 2 (Def. Ex. 35).  But, in a separate interrogatory response, Hafez couldn't recall any specific posts on the Club's website, the date of any posts, or the authors of those posts.  Doc. 340-38 at 7 (Def. Ex. 38).  Hafez also alleges that defendant relayed that it would repair the window cracking through statements in the bankruptcy proceeding; letters sent to owners; service publications sent to owners; and communications to individual owners and maintenance facilities.  Doc. 340-35 at 2 (Def. Ex. 35).

Hafez testified that he's never communicated with defendant.  Doc. 340-42 at 12 (Hafez Dep. 38:10–39:18).  Hafez also testified that no one from defendant or Cessna had made any promises to him, personally, about the aircraft.  *Id.* at 14 (Hafez Dep. 46:1–47:6).

Hafez flies the aircraft weekly.  *Id.* at 7 (Hafez Dep. 17:11–13).  He flies with his friends and family.  *Id.* at 17–18 (Hafez Dep. 59:21–60:6).  Hafez testified that he wouldn't fly with his friends and family if he felt the aircraft was unsafe.  *Id.* at 18 (Hafez Dep. 60:7–10).  Nor would he ever pilot a plane that he believed wasn't airworthy.  *Id.* (Hafez Dep. 60:11–13).  Hafez hasn't had any emergencies in the aircraft.  *Id.* at 8 (Hafez Dep. 20:12–14).  And Hafez never has had to ground the aircraft for maintenance or repairs for the cracks.  Doc. 340-35 at 2 (Def. Ex. 35).  Hafez testified that he'd understood for quite a while that the cracking issue is a cosmetic one, with no safety implications, but he'd heard of passenger-window failures possibly related to the window cracking.  Doc. 340-42 at 17 (Hafez Dep. 58:20–59:8).

***Plaintiff Jon-Michael Johnson/Matera***

19

In 2005, Lancair manufactured an aircraft with serial number 41521 and sold it to third party PS Air, Inc.  Doc. 340-3 (Def. Ex. 3).  This aircraft came with a three-year Lancair Warranty.  Later, an entity called Konsor Enterprises Inc. bought the aircraft.  *See* Doc. 340-30 at 1 (Def. Ex. 30).  In September 2008, Konsor reported the cracking to Cessna.  Doc. 363-32 at 2 (Pl. Ex. 32).  Cessna's notes indicate that Konsor previously had the cosmetic window cracks repaired under prior service letter SL-06-012C, but the cracking had occurred again.  *Id.*  Konsor sought to fix the cracking "before [the] warranty expires next month."  *Id.*  The aircraft underwent repairs for cracking in January 2009—while SB08-56-01 was in effect.  Doc. 363-50 at 2 (Pl. Ex. 50).  Despite this second repair, the cracking returned.

In 2021, Konsor sold the aircraft to plaintiff Matera Management, LLC.  Doc. 340-30 at 1 (Def. Ex. 30).  Plaintiff Jon-Michael Johnson is the managing member of Matera Management, LLC, Doc. 340-45 at 12 (Johnson Dep. 36:16–24), so the court refers to these plaintiffs together as Johnson.

Johnson noticed cracks around the windows of the plane before he bought it.  *Id.* at 7 (Johnson Dep. 13:14–23).  Before Johnson made his purchase, Konsor told him about this lawsuit.  *Id.* at 6 (Johnson Dep. 12:11–21).  Konsor suggested that Johnson join the lawsuit to get the cracking repaired.  *Id.* at 22–23 (Johnson Dep. 76:12–77:2).  And, before the purchase, Johnson spoke with an independent broker about the cracking.  *Id.* at 7 (Johnson Dep. 13:1–23).  The broker told Johnson that the cracking "was not an airworthiness issue."  *Id.* (Johnson Dep. 13:24–14:2).

In the purchase agreement, Johnson agreed to accept the aircraft's cosmetic wear and tear.  *Id.* at 13 (Johnson Dep. 39:7–40:1); *see also* Doc. 340-30 at 2 (Def. Ex. 30).  The purchase agreement doesn't purport to transfer the Lancair Warranty to Johnson.  *See generally* Doc. 340-

20

30 (Def. Ex. 30).  Despite the cracking and the lawsuit, Johnson bought the aircraft.  Doc. 340-45 at 13 (Johnson Dep. 39:7–40:1).  Defendant wasn't involved in the purchase in any way.  *Id.* at 14 (Johnson Dep. 42:7–10).

Like the other plaintiffs, Johnson claims that Cessna represented on the Club's website that it would repair the cracks on his aircraft.  Doc. 340-33 at 2 (Def. Ex. 33).  At his deposition, Johnson testified that he never had communicated with defendant.  Doc. 340-45 at 14 (Johnson Dep. 42:11–18).  Johnson further testified that he did not believe that defendant had lied to him. *Id.* at 23 (Johnson Dep. 79:17–80:8).

Since Johnson has owned the aircraft, no one ever has deemed it not airworthy.  *Id.* at 19 (Johnson Dep. 64:2–17).  Indeed, the aircraft undergoes the required FAA inspections, and no inspector has declared the aircraft unsafe.  *Id.*  Despite the cracks, Johnson believes his aircraft is airworthy and safe to fly.  *Id.* at 20 (Johnson Dep. 65:3–5, 67:9–11).  No one has told Johnson that the cracks are a safety of flight issue.  *Id.* at 23 (Johnson Dep. 78:20–24).  Johnson never has grounded the plane due to this issue and never has lost use of it because of the cracking.  *Id.* at 20 (Johnson Dep. 65:6–23).  Johnson flies for business and personal reasons, sometimes with his wife or other passengers.  *Id.* at 23 (Johnson Dep. 77:12–78:5).  He testified that he wouldn't fly—with or without passengers—if he felt the aircraft was unsafe.  *Id.*  Johnson maintains that he's not satisfied with the cracks.  He testified that even if it's "airworthy, nobody wants to . . . bring a shiny airplane home to show their friends and family something that has a bunch of cracks in it."  *Id.* at 22 (Johnson Dep. 76:6–11).

### *Plaintiff Alan Groves/Farm Boys*

In 2005, Lancair manufactured an aircraft with serial number 41510 and sold it to a third party.  Doc. 337 at 7 (PTO ¶ 2.a.xxv–vi.).  In March 2007, Columbia repurchased the aircraft and sold it to Alaris Aviation.  Doc. 340-11 at 1 (Def. Ex. 11).  The purchase agreement transferred

some sort of warranty to Alaris.  The agreement provided that the "balance of Factory and Component Manufacturing Warranties pertaining to this Aircraft will be transferred to [Alaris] provided [Alaris], per [Columbia's] Limited Warranty attached here to, contacts CAM's Customer Care group with appropriate and required ownership information." *Id.*  Plaintiffs assert that the March 2007 sale to Alaris created a new, five-year manufacturer's warranty.  Defendant disputes this proposition, asserting that Columbia sold the aircraft to Alaris with only the remaining balance of the CAM Limited Warranty.  Defendant has the better-supported view: any reasonable factfinder only could conclude that the warranty on this plane expired in September 2008.  Doc. 363-34 at 2 (Pl. Ex. 34).

In April 2007, Alaris sold the aircraft to plaintiff Farm Boys Investments LLC.  Doc. 340-13 at 1 (Def. Ex. 13).  Plaintiff Alan Groves is the sole member of Farm Boys Investments LLC, Doc. 340-44 at 9 (Groves Dep. 27:15–19), so the court refers to these plaintiffs collectively as Groves.

In the purchase agreement, Groves agreed to purchase the aircraft as is.  Doc. 340-13 at 2 (Def. Ex. 13).  The purchase agreement doesn't purport to transfer the Lancair Warranty to Groves.  *See generally id.*  Yet Groves testified that he believed, when he purchased the aircraft, the manufacturer warranty still would apply.  Doc. 340-44 at 15 (Groves Dep. 50:2–10).  Groves testified that Columbia paid for a strut issue identified at his purchase-related inspection.  *Id.* at 17 (Groves Dep. 56:7–57:6).  Columbia also replaced a radio.  *Id.* at 20 (Groves Dep. 69:25–70:17).  Columbia covered both the strut and the radio under a warranty.  *Id.*  These covered repairs led Groves to understand that he purchased the aircraft under some kind of warranty.  *Id.* (Groves Dep. 69:25–71:12).  Yet Groves never received any paperwork transferring the factory warranty to him.  *Id.* (Groves Dep. 71:1–4).  Groves explained that the "practice was that they

22

actually performed warranty repairs. So I assumed that it worked, . . . that the warranty was in place." *Id.* (Groves Dep. 71:6–9). But he didn't have any paperwork. *Id.* (Groves Dep. 71:1–4). And Groves never filed a warranty claim with defendant about the cracking. *Id.* (Groves Dep. 71:10–12).

Groves testified that defendant and Columbia weren't involved in his purchase of the aircraft. *Id.* at 17 (Groves Dep. 59:9–20). Groves never communicated with Columbia before he bought the aircraft. *Id.* (Groves Dep. 59:13–15). And he hasn't communicated with defendant since the purchase. *Id.* (Groves Dep. 59:16–20). In October 2007, Groves received notice of the Sale Order in the Columbia bankruptcy. Doc. 340-15 at 1, 33 (Def. Ex. 15).

Groves's aircraft has very fine cracking around all windows. Doc. 340-44 at 18 (Groves Dep. 62:12–63:21). Groves couldn't recall when the cracking started. *Id.* at 19 (Groves Dep. 66:9–18). After he discovered the cracking, Groves spoke with a maintenance facility about them. Doc. 340-32 at 2 (Def. Ex. 32). The facility's director of maintenance talked to Cessna, and Cessna told the director not to worry. Doc. 340-44 at 19 (Groves Dep. 67:10–22). Cessna said it had issued a repair bulletin, but the repair didn't work, so Cessna was working on the issue and would "get back to you." *Id.*

An interrogatory asked Groves to identify defendant's misrepresentations. Doc. 340-32 at 2 (Def. Ex. 32). Like the other plaintiffs, Groves responded that "Cessna ha[d] put out to the community including through [the Club] that these cracks are only cosmetic and that they would repair them." *Id.* At his deposition, Groves claimed to have seen posts on the Club's website. Doc. 340-44 at 20 (Groves Dep. 68:11–15). Groves described seeing on the website an "ongoing discussion about the attempt to come up with a repair and that it didn't work." *Id.* (Groves Dep. 68:11–22). Groves also testified that he never saw any posts from Cessna or defendant's

23

representative.  *Id.* (Groves Dep. 68:23–69:8).  And he testified that he'd never spoken with anyone at Cessna.  *Id.* (Groves Dep. 69:21–24).  Put simply, no one at defendant or Cessna ever made any promises to Groves to fix the cracking on his aircraft.  *Id.* at 23 (Groves Dep. 82:16–20).

No one has ever deemed Grove's aircraft not airworthy due to the cracking around the windows, annual inspections included.  *Id.* at 22 (Groves Dep. 78:20–22, 79:9–12).  Groves never has grounded the aircraft for maintenance due to the cracking.  *Id.* (Groves Dep. 79:13–15).  No one has ever told Groves that the cosmetic cracking presents a safety issue.  *Id.* at 23 (Groves Dep. 82:4–7).  Despite the Complaint's allegations that the cracking goes into the structure of the aircraft, Groves testified, "There's no way it goes into the structure."  *Id.* at 19 (Groves Dep. 65:20–66:1).  Groves flies with passengers often—*i.e.*, his wife, friends, and flight instructor.  *Id.* at 22–23 (Groves Dep. 79:16–80:6).  His flight instructor also flies the aircraft and takes his family with him.  *Id.* at 23 (Groves Dep. 80:10–22).  And Groves testified that he wouldn't let someone else fly in the aircraft if he didn't believe it was airworthy.  *Id.* at 23 (Groves Dep. 81:7–10).

### *Plaintiff Bogdan Cocosel/Loki Operations*

In 2006, Columbia manufactured an aircraft with serial number 41683 and sold it directly to plaintiff Loki Enterprises LLC.  Doc. 340-7 at 1–2 (Def. Ex. 7).  The aircraft came with a three-year CAM Warranty.  *Id.* at 6.  Loki Enterprises since has become Loki Operations LLC.  Doc. 340-46 at 19 (Cocosel Dep. 58:7–21).  Plaintiff Bogdan Cocosel is a member of Loki Operations, LLC, which exists primarily to own this aircraft.  *Id.* (Cocosel Dep. 58:19–21, 59:20–23).  The court will refer to these two plaintiffs, collectively, as Cocosel.

When Cocosel picked up the aircraft at Columbia's factory in 2006, it had hairline cracks.  *Id.* at 32 (Cocosel Dep. 113:2–8).  Columbia fixed the cracking at the factory.  *Id.* (Cocosel Dep.

24

113:15–25).  In 2007, Cocosel noticed cracking again.  *Id.* at 34 (Cocosel Dep. 119:3–13).

Cocosel told his shop about the issue.  *Id.* at 34–35 (Cocosel Dep. 121:15–122:7).  The shop

contacted Columbia, and eventually Cocosel flew the plane back to Columbia's factory.  *Id.* at 35

(Cocosel Dep. 122:8–123:4).  Columbia repaired Cocosel's aircraft a second time, while the

aircraft was under warranty.  *Id.* (Cocosel Dep. 124:25–125:20).  A few months later, in 2008,

Cocosel noticed "incredibly fine" paint cracks yet again.  *Id.* at 38 (Cocosel Dep. 135:2–13).

Cocosel reported the cracking issue—among other, higher priority issues—to Columbia.  *Id.*

(Cocosel Dep. 136:16–137:11).  Meanwhile, Columbia had declared bankruptcy.  *Id.* (Cocosel

Dep. 137:10–13).  After Cessna took over, Cocosel had the aircraft repaired at his shop.  *Id.* at

38–39 (Cocosel Dep. 137:23–138:9).  This 2008 repair also was covered under the warranty.  *Id.*

at 40 (Cocosel Dep. 144:19–24).  Following this 2008 repair, Cocosel didn't notice any cracking

for two-and-a-half years.  *Id.* at 41 (Cocosel Dep. 146:6–11).

Cocosel testified that Cessna repaired the paint cracks "under warranty" with "the normal

repairs until the warranty hit this real limit."  *Id.* at 44 (Cocosel Dep. 158:3–19).  After the

warranty hit that limit, "they no longer paid for anything."  *Id.* (Cocosel Dep. 158:14–24).

Cocosel maintains that "the paint cracks was carried over because they didn't have a fix."  *Id.*

Throughout all of the repairs, Cocosel testified that he never contacted Cessna; all

communications with Cessna went through his service center.  *Id.* at 40 (Cocosel Dep. 145:16–

22).

Cocosel complained of broken promises.  When asked who made these promises,

Cocosel said, "If you want names, I can dig them out basically from message boards and from

the emails.  I don't remember the exact names of the persons.  I guess executives at Cessna."  *Id.*

at 45–46 (Cocosel Dep. 165:23–166:4).  Later, when asked which executives made promises to

him, Cocosel testified, "Again, I can dig them up for you, if you want actually these exact names. But it was the CEO of the company at the time in . . . 2008. I forgot his name." *Id.* at 48 (Cocosel Dep. 174:7–13). But Cocosel then clarified that he "didn't talk to him personally" and the communication from the CEO occurring "during [the] bankruptcy." *Id.* (Cocosel Dep. 174:16–20). Cocosel said, "there were four or five owner representatives that were in contact with Cessna at the time and they were relaying basically what was being discussed and what promises were being made[.]" *Id.* (Cocosel Dep. 174:25–175:5). Cocosel specifically mentioned promises made during Columbia's bankruptcy proceedings. *Id.* at 46 (Cocosel Dep. 166:5–23). And Cocosel mentioned that he'd attended an owner's meeting where Cessna said not to worry, Cessna would comply with the warranty. *Id.* (Cocosel Dep. 167:15–168:1).

Cocosel flies the aircraft regularly, primarily with his wife. *Id.* at 26 (Cocosel Dep. 86:10–23). When asked if he was concerned about safety with the cracking, Cocosel responded, "Concerned about the safety? It's a paint crack." *Id.* (Cocosel Dep. 87:19–23). Cocosel emphasized that he isn't concerned about the cracking: "Had I been concerned, I would not have flown it for 19 years." *Id.* (Cocosel Dep. 88:19–24). Instead, Cocosel is "mainly concerned about . . . the aesthetic value[.]" *Id.* (Cocosel Dep. 88:24–89:2).

## II.    Legal Standard

Summary judgment is appropriate where the moving party demonstrates there is "no genuine dispute" about "any material fact" and that the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This standard dictates that the court "view the evidence and make inferences in the light most favorable to the non-movant." *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (citing *Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243, 1245–46 (10th Cir. 2010)).

26

"An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense." *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'" *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)). To carry this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'" *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)). Even if the non-moving party fails to respond adequately, "the district court may not grant the motion without first examining the moving party's submission to determine if it has met its initial burden of demonstrating that no material issues of fact remain for trial and the moving party is entitled to judgment as a matter of law." *Reed v. Bennett*, 312 F.3d 1190, 1194–95 (10th Cir. 2002).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof.'" *Kannady*, 590 F.3d at 1169 (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49. The specific "facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007) (citing *Adler*, 144

27

F.3d at 671).  Affidavits and testimony "must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient."  *Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1030–31 (10th Cir. 2022) (quotation cleaned up).

Federal courts don't view summary judgment as a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327.  Instead, it represents an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'"  *Id.* (quoting Fed. R. Civ. P. 1).

## III.        Analysis[11]

As mentioned earlier, plaintiffs have waived their implied-warranty and deceptive-trade-practices claims.  Doc. 362 at 7.  That leaves three claims:  breach of express warranty, fraud,

---

[11]       A federal district court sitting in diversity—as here—must apply the choice-of-law rules of the state where the court is located.  *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  The court thus applies Kansas choice-of-law principles.

Plaintiffs bring one contract-based claim:  breach of express warranty.  Kansas choice-of-law rules divide contract claims into two categories:  (1) disputes that go "to the substance of the obligation"; and (2) questions that go "to the manner and method of performance[.]"  *Moses v. Halstead*, 581 F.3d 1248, 1252 (10th Cir. 2009) (applying Kansas choice-of-law rules).  This case belongs in the latter category.  *See id.* at 1253 ("In general, fulfillment of a contractual obligation goes to the manner and method of performance by the party charged with the obligation.").  So, the law of the place of performance applies to plaintiffs' express-warranty claim.  *Id.* at 1252.  "'The place of performance is the state where, either by specific provision or by interpretation of the language of the promise, the promise is to be performed.'"  *ARY Jewelers, L.L.C. v. Krigel*, 85 P.3d 1151, 1162 (Kan. 2004) (quoting Restatement (First) of Conflict of Laws § 355 (A.L.I. 1934)).  The individual plaintiffs—California citizens, *see* Doc. 337 at 2–3 (PTO ¶ 1.b.)—maintain that defendant should pay for the window cracking on their planes. Because that payment would go to California citizens, the court concludes that California law applies to plaintiffs' express-warranty claims.  In the Pretrial Order, the parties agreed that Oregon law governs plaintiff Cocosel's claims, *id.* at 4, but they never explain this conclusion.  And the court declines to go hunting through the summary-judgment record for an explanation of this anomaly.  Fortunately, the parties briefed both Oregon and California law, so this decision won't cause any prejudice.

Plaintiffs also bring tort claims.  Under Kansas choice-of-law principles, in tort cases "the law of the state where the tort occurred—*lex loci delicti*—should apply."  *Ling v. Jan's Liquors*, 703 P.2d 731, 735 (Kan. 1985).  Under "the doctrine of *lex loci delicti*, the situs of the injury determines the governing law."  *Id.*  Because the plaintiffs are California citizens, they felt the injury from defendant's alleged fraud in California.  The court notes that plaintiff Apsis Aviation, LLC is an Oregon limited liability company, but its sole member, plaintiff Adam Hafez, is a California citizen.  So, even Apsis Aviation LLC felt—experienced—its injury in California.  The court thus applies California law to plaintiffs' tort claims.

and negligent misrepresentation. *Id.* The court begins its analysis with the express-warranty claim. It then analyzes the fraud and negligent misrepresentation claims together.

### A.    Express Warranty

The express-warranty analysis differs for plaintiff Cocosel (who bought his aircraft directly from defendant) and the rest of the plaintiffs, who bought their aircraft from a third party. The court begins with Cocosel.

### 1.    Cocosel

Plaintiff Cocosel is the only direct purchaser. Cocosel bought his aircraft in 2006, and it came with a three-year CAM warranty. Doc. 340-7 at 1–2, 6 (Def. Ex. 7). Cocosel had the cracking repaired under this warranty a few times. The last repair occurred in 2008, and Cessna covered the repair under warranty. Doc. 340-46 at 40 (Cocosel Dep. 144:19–24). After that 2008 repair, Cocosel didn't notice any cracking for two-and-a-half years. *Id.* at 41 (Cocosel Dep. 146:6–11). Based on these events, plaintiffs advance two theories of express-warranty breach.

Plaintiffs first claim that defendant breached Cocosel's express warranty because the warranty repair didn't remedy the issue. Plaintiffs don't cite any authority for this proposition. *See* Doc. 362 at 35. That's likely because there isn't any. "Under California law, a plaintiff cannot maintain a breach of warranty claim for a product that is repaired within the warranty period and fails again months after the warranty has expired." *Frenzel v. AliphCom*, 76 F. Supp. 3d 999, 1019 (N.D. Cal. 2014) (quotation cleaned up) (collecting cases); *see also Baranco v. Ford Motor Co.*, 294 F. Supp. 3d 950, 973–74 (N.D. Cal. 2018) (dismissing plaintiffs' breach-of-express-warranty claim based on theory that repair during warranty period "was not a true repair" because—even though repair didn't prevent reoccurrence after warranty's expiration—defendant's initial repair complied with warranty). This is so because the "general rule is that an

express warranty does not cover repairs made after the applicable time or mileage periods have elapsed." *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1023 (9th Cir. 2008) (quotation cleaned up) (applying California law). This first theory of breach won't work for plaintiffs.

Plaintiffs have a second theory of breach of Cocosel's express warranty: defendant waived the warranty's limitation period by pledging "to develop an effective repair" and doing "nothing for 16 years until the December 2024 service bulletin." Doc. 362 at 35. In support of this theory, plaintiffs cite the following evidence.

Plaintiffs cite Steve Masters's Declaration, in which Masters attested that he attended a bankruptcy hearing. Doc. 363-30 at 2 (Masters Decl. ¶ 3). According to Masters, at the bankruptcy hearing, Cessna's president acknowledged the window cracking and said that Cessna would resolve the issue for all affected aircraft. *Id.* (Masters Decl. ¶¶ 4–6). Masters attested that Cessna's president represented that all aircraft under warranty at the time of Cessna's acquisition "would be covered and have the defect repaired at no cost to the owner by Cessna." *Id.* (Masters Decl. ¶ 6). Based on this evidence, plaintiffs argue that these statements "effectively voided / mooted any time limitation provision because Defendant accepted that all aircraft had this defect and were (or would become) in need of repair." Doc. 362 at 33. But plaintiffs cite no legal authority to support this proposition.

Plaintiffs also emphasize Cocosel's deposition. Cocosel testified that, after the bankruptcy, he attended a meeting in Bend. Doc. 340-46 at 46 (Cocosel Dep. 167:4–16). He claims that, during this meeting, someone—he couldn't remember who—said not to worry, Cessna would stand behind all promises and comply with the warranty. *Id.* (Cocosel Dep. 167:23–168:2).

30

Plaintiffs also make much of service bulletin SB08-56-01 and its subsequent revocation. When defendant revoked SB08-56-01, they sent letters to customers promising a future repair and promising that "warranty coverage will be available for repairs covered by this service bulletin." Doc. 363-13 at 2 (Pl. Ex. 13). None of these letters went to Cocosel or any other plaintiff at issue on this motion. *See generally id.* Plaintiffs also cite Cessna's employee, Richard Ake, telling a customer, Andrea Hudson, in November 2010 that a "credit program will be applicable when the bulletin is released." Doc. 363-8 at 2–3 (Pl. Ex. 8). Again, this communication went to Andrea Hudson—not Cocosel or any other plaintiff here.

Relying on this collection of evidence, plaintiffs claim waiver of the warranty's time limitation. "The burden is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the matter to speculation, and doubtful cases will be decided against a waiver." *Stephens & Stephens XII, LLC v. Fireman's Fund Ins. Co.*, 180 Cal. Rptr. 3d 683, 698 (Cal. Ct. App. 2014) (quotation cleaned up). A party can waive a right expressly, "based on the words of the waiving party," or implicitly, "based on conduct indicating an intent to relinquish the right." *Id.* (quotation cleaned up). "California courts will find waiver when a party intentionally relinquishes a right or when that party's acts are so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished." *Waller v. Truck Ins. Exch., Inc.*, 900 P.2d 619, 637 (Cal. 1995) (quotation cleaned up).

Plaintiffs here haven't shouldered their burden on this waiver theory. Indeed, plaintiffs don't bother to cite any caselaw supporting their waiver argument—much less characterize the waiver as explicit or implicit. *See* Doc. 362 at 32–37. On the explicit front, plaintiffs have adduced evidence of only one statement that defendant made to Cocosel: "Cessna stands behind

31

all promises. We will comply with warranty." Doc. 340-46 at 46 (Cocosel Dep. 167:23–168:2). No reasonable factfinder could find that defendant, by making this statement, intentionally and expressly relinquished its right to declare a warranty claim untimely. This statement is vague; it doesn't reference any specific promises. And this statement says nothing about time limitations or expiration. To the contrary, the statement refers to the warranty—which contains a time limitation. This statement thus falls far short of "clear and convincing evidence that does not leave the matter to speculation[.]" *Stephens*, 180 Cal. Rptr. 3d at 698.

Nor have plaintiffs adduced evidence of implicit waiver. Plaintiffs have assembled no evidence that Cocosel knew about the rest of defendant's conduct—*i.e.*, the bankruptcy statements; the letters to customers about SB08-56-01's revocation; the statement to Hudson. Without Cocosel knowing about these specific acts, these acts can't "induce a reasonable belief" that defendant relinquished its right to declare Cocosel's warranty expired. *Waller*, 900 P.2d at 637 (quotation cleaned up); *see also Dones v. Life Ins. Co. of N. Am.*, 269 Cal. Rptr. 3d 626, 636 (Cal. Ct. App. 2020) (explaining equitable roots of waiver require plaintiff to have relied on defendant's conduct that caused his injury); *see below* § III.B.1 (explaining lack of evidence of Cocosel's reliance on defendant's statements). Cocosel's impression was based largely on vibes and rumors: unspecified statements from message boards, emails, and meetings. Doc. 362 at 34. No reasonable factfinder could find waiver here without speculating—and California law forbids such speculation. *Stephens*, 180 Cal. Rptr. 3d at 698.

The court thus concludes that Cocosel's express-warranty claim can't survive summary judgment.

### 2.    Other Plaintiffs

The plaintiffs who bought their aircraft from someone other than defendant—plaintiffs Groves, Eater, Hafez, and Johnson—face heavy crosswinds on their express-warranty claims.

32

These plaintiffs didn't buy their aircraft from defendant, so they lack privity of contract. Under California law, "'privity of contract is required in an action for breach of either express or implied warranty and . . . there is no privity between the original seller and a subsequent purchaser who is in no way a party to the original sale.'" *Watkins v. MGA Ent., Inc.*, 574 F. Supp. 3d 747, 754 (N.D. Cal. 2021) (quoting *Burr v. Sherwin Williams Co.*, 268 P.2d 1041, 1048 (Cal. 1954)).

These secondary-purchaser plaintiffs also have a transfer problem. The original warranties prohibited the original buyers from transferring the warranty without defendant's consent. Doc. 340-5 at 1–2 (Def. Ex. 5); Doc. 340-10 at 1–2 (Def. Ex. 10). These plaintiffs have adduced no evidence that they secured defendant's consent for the warranty's transfer. And plaintiffs would have nothing to transfer anyway; the original warranties expired well before they bought their aircraft. Only Groves bought the aircraft during the original warranty's existing life. Groves thought the manufacturer warranty still would apply. But he admitted that he had no paperwork transferring the warranty to him; he merely assumed the transfer because Columbia had covered other repairs under warranty. Doc. 340-44 at 15, 20 (Groves Dep. 50:2–10, 71:1–9). Even if Groves had transferred the warranty successfully, it expired in 2010.[12]

So, the secondary-purchaser plaintiffs' express-warranty claims can't survive the undisputed timeline or the plane's purchase history. Searching for friendlier skies, plaintiffs try to spin up a new express warranty based on the Columbia bankruptcy. Recall that the bankruptcy Sale Order required Cessna to "send to all known owners who are currently covered by a warranty from [Columbia] (collectively, an "Unexpired Warranty"), a standard Certificate

---

[12]    Plaintiffs argue that defendant waived the warranties' provision that prevents transfer. But, even if that's true, plaintiffs have failed to show by clear-and-convincing evidence that defendant waived the warranties' time limitation. So, even if plaintiffs transferred the warranties, those warranties have expired.

33

of Warranty from Cessna good for the remaining term of the Unexpired Warranty from [Columbia]." Doc. 340-17 at 10 (Def. Ex. 17). This "new Cessna Warranty" replaced "the Unexpired Warranty in its entirety, unless an existing Unexpired Warranty held by an owner provide[d] greater rights to such owner, in which case the existing Unexpired Warranty shall apply." *Id.* And the secondary purchasers' aircraft were under warranty at the time of the bankruptcy. Plaintiffs thus conclude that defendant issued Certificates of Warranty to their aircrafts' previous owners and those Certificates of Warranty provided new express warranties. Doc. 362 at 36–37. This matters for their express-warranty claims, plaintiffs assert, because there "is no evidence of a time limitation—particularly concerning the window cracking issue, in those Certificates, nor is there evidence that those certificates precluded transferability." *Id.* at 32.

But there's the problem for plaintiffs: no evidence. "Under California law a claim for breach of express warranty requires a showing of the exact terms of the warranty." *Hastings v. Ford Motor Co.*, No. 19-02217-BAS-MDD, 2022 WL 848330, at *13 (S.D. Cal. Mar. 22, 2022) (quotation cleaned up); *see also Williams v. Beechnut Nutrition Corp.*, 229 Cal. Rptr. 605, 608 (Cal. Ct. App. 1986) (requiring plaintiffs to "allege the exact terms of the warranty" for express-warranty claims). Because the plaintiffs at issue here haven't adduced any evidence of the terms of the Certificates of Warranty, their express-warranty claims based on the Certificates of Warranty fail as a matter of law. *See Hastings*, 2022 WL 848330, at *13 (granting summary judgment against express-warranty claim where plaintiff failed to establish exact terms of extended service plan); *May v. KCS Int'l Inc.*, No. 09-01336 DOC (MLGx), 2011 WL 13268067, at *3 (C.D. Cal. June 7, 2011) (granting summary judgment against express warranty claim

34

because plaintiff had "not met his burden of providing the Court with the terms of the Brunswick express warranty").

Sensing these headwinds, plaintiffs complain that defendant failed to produce copies of the Certificates of Warranty. Doc. 362 at 32. As already stated, on summary judgment following the close of discovery is far too late to complain about discovery issues. Without any copies of the Certificates of Warranty issued for their planes, plaintiffs have proffered an example Certificate of Warranty. *See* Doc. 363-25 at 2 (Pl. Ex. 25). Even assuming that this example suffices to shoulder plaintiffs' summary-judgment burden, plaintiffs still face a dispositive problem: the example Certificate of Warranty explicitly states that the warranty is good "for the remaining period of the Columbia OEM airframe warranty[.]" *Id.* (emphasis omitted). So, even if Cessna created new warranties with the Certificates of Warranty—based on the sole example of a Certificate of Warranty contained in the summary-judgment record—those new warranties expired when the original warranties expired.

The secondary-purchaser plaintiffs also advance a waiver argument. Doc. 362 at 37. Again, they cite no legal authority and never bother to characterize the waiver as express or implicit. And this waiver argument is even weaker than Cocosel's. It's undisputed that defendant never made any statements directly to these secondary purchasers, so express waiver is out. Instead, these secondary purchasers are speculating about defendant's intent to relinquish its rights under the warranty based on defendant's various statements. For example, the secondary purchasers cite rumors created by statements defendant's attorney made during a bankruptcy hearing—that none of these secondary-purchaser plaintiffs attended. *See id.* Plaintiffs have failed to adduce clear and convincing evidence that defendant waived its right to declare their

warranty claims untimely.  No reasonable factfinder could conclude otherwise without speculating, which runs afoul of California law.  *Stephens*, 180 Cal. Rptr. 3d at 698.

In sum, the court grants defendant summary judgment against the secondary purchasers' express-warranty claims.

## B.     Fraud and Negligent Misrepresentation

This leaves two overlapping claims:  one claiming fraud and one claiming negligent misrepresentation.  Doc. 337 at 59–67 (PTO ¶ 4.a.iii–iv.).  And, within the fraud claim, plaintiffs invoke two theories of fraud:  intentional misrepresentation and fraudulent concealment. Because the elements of an intentional-misrepresentation fraud claim and those of a negligent-misrepresentation claim overlap so heavily, the court addresses them together.

### 1.     Intentional and Negligent Misrepresentation

"The essential elements of a count for intentional misrepresentation are (1) a misrepresentation, (2) knowledge of falsity, (3) intent to induce reliance, (4) actual and justifiable reliance, and (5) resulting damage."  *Chapman v. Skype Inc.*, 162 Cal. Rptr. 3d 864, 875 (Cal. Ct. App. 2013).  A negligent misrepresentation has four of the same elements—only the knowledge element differs.  Negligent misrepresentation "does not require knowledge of falsity but instead requires a misrepresentation of fact by a person who has no reasonable grounds for believing it to be true."  *Id.*  Defendant makes a variety of arguments about these elements, but the court need only reach one of them:  reliance.

"Actual reliance occurs when a misrepresentation is an immediate cause of a plaintiff's conduct, which alters his legal relations, and when, absent such representation, he would not, in all reasonable probability, have entered into the contract or other transaction."  *Engalla v. Permanente Med. Grp., Inc.*, 938 P.2d 903, 919 (Cal. 1997) (quotation cleaned up).  A fraud plaintiff needn't show that his "reliance upon the truth of the fraudulent misrepresentation be the

sole or even the predominant or decisive factor in influencing his conduct." *Id.* (quotation cleaned up). Instead, a fraud plaintiff need only show "that the representation has played a substantial part, and so has been a substantial factor, in influencing his decision." *Id.* (quotation cleaned up).

Plaintiffs' theory of fraud here goes something like this: Defendant knew about the window cracking when it bought Columbia out of its bankruptcy. After this purchase, defendant issued SB08-56-01 to repair the cracking. Defendant suspended SB08-56-01 a mere 72 days later. Following this suspension, defendant told other owners—never any plaintiffs directly, mind you—that it would revise the service bulletin and provide warranty coverage under the new service bulletin. *See, e.g.*, Doc. 363-13 at 2 (Pl. Ex. 13). But defendant didn't develop a revised service bulletin until 2022. And this revised service bulletin didn't include a credit program like the one in SB08-56-01. *See generally* Doc. 363-18 (Pl. Ex. 18). In plaintiffs' view, defendant falsely represented that it would develop an effective repair and cover that repair under warranty. Instead, defendant "dragged its feet" for years, during which no repair ever was authorized. Doc. 362 at 42. Meanwhile, the warranties expired.

Plaintiffs, when arguing their misrepresentation claims, hardly mention reliance. They merely claim that these "representations harmed Plaintiffs who relied on them in purchasing their aircraft with the belief that Textron intended to honor its promises." *Id.* at 41. Plaintiffs cite no law and no facts for this proposition. They don't bother to connect any of these statements to any plaintiff's purchase. This just won't do. *E.g., United States v. Moya*, 5 F.4th 1168, 1192 (10th Cir. 2021) (explaining that litigants waive arguments "when they are inadequately presented" (quotation cleaned up)); *Sawyers v. Norton*, 962 F.3d 1270, 1286 (10th Cir. 2020) ("This briefing-waiver rule applies equally to arguments that are . . . presented only in a

37

perfunctory manner." (quotation cleaned up)).  The court thus grants defendant's summary-judgment motion against these misrepresentation claims because plaintiffs have waived any argument that they relied on any misrepresentations with their perfunctory briefing.

Waiver aside, once defendant's summary-judgment motion challenged plaintiffs' ability to prove an element of their misrepresentation claims, the summary-judgment burden shifted to plaintiffs. *Kannady*, 590 F.3d at 1169.  This shift required plaintiffs—who would have the burden to prove reliance at trial—to identify evidence from which a reasonable jury could find that they relied on defendant's misrepresentations.  They failed that burden, failing "to set forth specific facts . . . from which a rational trier of fact could find for" them on the reliance element. *Schulenberg v. BNSF Ry. Co.*, 911 F.3d 1276, 1286 (10th Cir. 2018) (quotation cleaned up). Defendant thus deserves summary judgment against plaintiffs' misrepresentation claims.

And even if the court could do plaintiffs' job for them and comb through the evidence, it still would grant defendant summary judgment on these claims.  No plaintiff attended the bankruptcy hearing.  No plaintiff has testified that they relied on the credit program provided in SB08-56-01 when purchasing their aircraft.  No plaintiff has testified that they knew about the letters defendant sent to other owners promising a credit program in the revised service bulletin. To the contrary, plaintiffs Cocosel and Groves bought their aircraft before the bankruptcy and subsequent events, so they couldn't have relied on any of the above when making their purchases.  In plaintiff Hafez's case, the cracking on his aircraft appeared *after* he bought it. Doc. 340-42 at 15 (Hafez Dep. 50:25–51:5).  Only after he made his purchase did fellow owners tell Hafez that defendant was working on a fix.  *Id.* at 9, 19 (Hafez Dep. 24:8–25, 65:5–22). Hafez never attested that he relied on a promised fix when he made his purchase.  In short, no reasonable factfinder could conclude that plaintiffs Cocosel, Groves, or Hafez relied on any

misrepresentations when purchasing their aircraft.  This leaves merely plaintiffs Eater and Johnson.

Eater and Johnson both noticed cracking before their purchases.  Doc. 340-34 at 2 (Def. Ex. 34); Doc. 340-45 at 7 (Johnson Dep. 13:14–23).  In Eater's case, the seller told him that the cracking was merely cosmetic, the manufacturer was working on a fix, and the manufacturer would provide a future fix.  Doc. 340-34 at 2 (Def. Ex. 34).  Johnson's seller told him about this lawsuit and suggested that he join the suit to get the cracking repaired.  Doc. 340-45 at 6, 22–23 (Johnson Dep. 12:11–21, 76:12–77:2).

These statements by the people who sold Eater and Johnson their airplanes—that defendant would fix the cracking—came from third parties.  And it's simply not clear how these third-party sellers came to conclude that defendant would fix the cracking.  For example, as best the court can tell, when Johnson's seller told him that defendant was working on a fix, the seller based that impression on *this very lawsuit*. *Id.* at 7 (Johnson Dep. 15:25–16:2).  There's simply no evidence that the seller ever had seen one of the misrepresentations plaintiffs complain now about—*i.e.*, SB08-56-01, letters to owners, or statements made in the bankruptcy proceedings.  That's a problem.  California law requires a plaintiff "to establish a complete causal relationship between the alleged misrepresentations and the harm claimed to have resulted therefrom." *Mirkin v. Wasserman*, 858 P.2d 568, 573 (Cal. 1993) (quotation cleaned up).  Plaintiffs here fail this requirement because they've made no effort to connect the (a) the misrepresentations complained of to (b) Eater and Johnson's purchases.

This failure spells doom for Eater and Johnson because they must show "that the representation has played a substantial part, and so has been a substantial factor, in influencing his decision." *Engalla*, 938 P.2d at 919 (quotation cleaned up).  And, under California law,

39

proof "of causation cannot be based on speculation and conjecture, and evidence establishing a mere possibility of causation is insufficient." *Saldano v. United States*, No. 01-5462 LJO, 2007 WL 2789595, at *4 (E.D. Cal. Sept. 20, 2007) (collecting cases), *aff'd*, 318 F. App'x 599 (9th Cir. 2009). Because plaintiffs have failed to establish a complete causal relationship between the misrepresentations complained of and Eater and Johnson's purchases of their aircraft, a reasonable factfinder could only speculate. That's not enough.

In sum, plaintiffs have failed to shoulder their burden to demonstrate a triable issue of reliance. Their failure entitles defendant to summary judgment against their intentional-misrepresentation fraud claim and negligent-misrepresentation claim.

## 2.    Fraudulent Concealment

Under California law, a claim for fraudulent concealment has five elements:

(1) the defendant must have concealed or suppressed a material fact,

(2) the defendant must have been under a duty to disclose the fact to the plaintiff,

(3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff,

(4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and

(5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage.

*Kaldenbach v. Mut. of Omaha Life Ins. Co.*, 100 Cal. Rptr. 3d 637, 652 (Cal. Ct. App. 2009) (quotation cleaned up). The court trains its focus on the second element: duty.

"Whether a duty exists is a question of law to be resolved by the court." *Rattagan v. Uber Techs., Inc.*, 553 P.3d 1213, 1229 (Cal. 2024) (quotation cleaned up). Helpfully, California's Supreme Court has identified five scenarios where a duty to disclose arises:

(1) it is imposed by statute;

40

(2) the defendant is acting as plaintiff's fiduciary or is in some other confidential relationship with plaintiff that imposes a disclosure duty under the circumstances;

(3) the material facts are known or accessible only to defendant, and defendant knows those facts are not known or reasonably discoverable by plaintiff (i.e., exclusive knowledge);

(4) the defendant makes representations but fails to disclose other facts that materially qualify the facts disclosed or render the disclosure misleading (i.e., partial concealment); or

(5) defendant actively conceals discovery of material fact from plaintiff (i.e., active concealment).

*Id.* at 1238. Plaintiffs never assert that a statute imposes a duty. And they expressly disclaim a fiduciary relationship. *See* Doc. 362 at 39. So, the first two options are out.

Instead, plaintiffs argue that, as "the manufacturer and Type Certificate holder of the TTx aircraft, Defendant had a duty to disclose facts concerning this aircraft to these five plaintiffs." *Id.* at 40. Plaintiffs cite zero legal authority for this proposition. *See id.* As best the court can tell, plaintiffs are trying to utilize the final three circumstances: exclusive knowledge, partial concealment, and active concealment. But these three circumstances "presuppose a preexisting relationship between the parties, such as between seller and buyer, employer and prospective employee, doctor and patient, or parties entering into any kind of contractual agreement." *Rattagan*, 553 P.3d at 1238 (quotation cleaned up). Plaintiffs have not explained how their relationships with defendant resembles any of these circumstances.

As best the court can tell, plaintiffs aspire to invoke a manufacturer-consumer relationship. But "California courts have generally rejected a broad obligation to disclose[.]" *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1141 (9th Cir. 2012). And "a manufacturer's duty to consumers is limited to its warranty obligations absent either an affirmative misrepresentation or a safety issue." *Opperman v. Path, Inc.*, 87 F. Supp. 3d 1018, 1052 (N.D.

41

Cal. 2014) (quotation cleaned up) (applying California law). Plaintiffs' affirmative-misrepresentation claims, as just discussed, fail. And they've abandoned their theory that the cracking presents a safety issue. So, no duty exists here based solely on defendant's status as a manufacturer of these aircraft.

Only one plaintiff has any other kind of relationship with defendant: Cocosel. He bought his aircraft from defendant. The other four plaintiffs have no preexisting relationship with defendant so their fraudulent-concealment claims fail for lack of duty. *See Hoffman v. 162 N. Wolfe LLC*, 175 Cal. Rptr. 3d 820, 827–32 (Cal. Ct. App. 2014) (surveying California law on fraudulent concealment when plaintiff has no relationship with defendant and concluding that California courts "have rejected fraud claims founded on nondisclosure where there was an absence of a relationship between the plaintiff and the defendant."); *see also LiMandri v. Judkins*, 60 Cal. Rptr. 2d 539, 543 (Cal. Ct. App. 1997) ("As a matter of common sense, such a relationship can only come into being as a result of some sort of *transaction* between the parties." (emphasis in original)). That just leaves Cocosel.

Even assuming that defendant owed Cocosel some kind of duty based on their buyer-seller relationship, that duty applied only to the sale itself. *LiMandri*, 60 Cal. Rptr. 2d at 543–44 (explaining that duty created by transaction is "a duty to disclose facts material to the transaction"). That is, the "transaction about which parties have a duty to disclose material facts is the transaction giving rise to the relationship." *Radus Tek Servs., Inc. v. IDC Techs. Inc.*, 767 F. Supp. 3d 972, 982 (N.D. Cal. 2025) (applying California law). So, defendant had a duty to disclose material facts to Cocosel in the context of the sale. Plaintiffs don't cite—and the court couldn't locate—any authority suggesting that the buyer-seller relationship creates an ongoing,

42

post-sale duty for the seller to disclose all facts about the item the seller previously sold to the buyer.

In sum, the court concludes that plaintiffs' fraud claim based on fraudulent concealment fails as a matter of law.

## IV.    Conclusion

Defendant is entitled to summary judgment against plaintiffs' claims for breach of express warranty, fraud, and negligent misrepresentation.  This conclusion disposes of all claims preserved for trial by these nine plaintiffs.[13]

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's Motion for Summary Judgment (Doc. 339) is granted.

**IT IS FURTHER ORDERED THAT** defendant's Motion to Strike (Doc. 367) is denied.

**IT IS SO ORDERED.**

**Dated this 30th day of March, 2026, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**

---

[13]    Because the court resolves defendant's summary-judgment motion on the grounds articulated above, it needn't consider defendant's other arguments for summary judgment.  Of particular importance: the court needn't consider defendant's argument about plaintiffs' damages issues.  Defendant has filed a Motion to Strike (Doc. 367) plaintiffs' untimely damages evidence.  Because the court grants summary judgment without reaching these timeliness issues, defendant's Motion to Strike is moot, and the court denies it. *See* Doc. 379 at 2, 10, 11 (suggesting, in reply to motion to strike, that granting summary judgment on any grounds other than damages ground would render the motion to strike moot).